# EXHIBIT 1

**John Foster-Bey, et al.**
**v.**
**Sherrie S. Wain, et al.**

**USDC-Alexandria**
**Civil Action No.:**
**1:13-cv-1382**

**EXPERT WITNESS REPORT**
**PURSUANT TO**
**FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(B)**

**John Foster-Bey and CSR, Inc. vs. Wain and McManus**
**Civil Action No. 1:13CV1382**
**U.S. District Court**
**Eastern District of Virginia (Alexandria Division)**

Prepared by:

**Paul Horn**
**President**
**WorkPlace Consultants, LLC**
**Bethesda, MD**





## Table of Contents

|  | Page |
|---|---|
| I. Introduction | 3 |
| II. Qualifications | 4 |
| III. Summary of Opinions Rendered | 5 |
| IV. Basis for these Opinions | 8 |
| V. Information Considered | 27 |
| VI. Compensation | 29 |
| VII. Cases | 29 |
| VIII. Signature | 29 |
| Appendix A | 30 |

I.     **Introduction**

This report sets forth my opinions as to why the defendants, Sherrie Wain and Terence McManus, in their capacity as trustees of the CSR, Incorporated Employee Stock Ownership Plan ("ESOP") and as members of the CSR, Incorporated board of directors failed to act as prudent fiduciaries by engaging in self-dealing to the detriment of ESOP participants.

An ESOP is a type of retirement plan that can hold all plan assets in the form of the capital stock of the company that is the plan sponsor.  The ESOP was the principal shareholder of CSR, Incorporated (hereinafter "CSR" or the "Company") and owned over 92% of the Company's issued and outstanding shares of capital stock throughout the period defendants served jointly as the ESOP trustee.  The remaining Company shares were held by Ms. Wain[1] until 2011 when she sold them and the ESOP became the 100% owner of the Company.

The defendants served as the sole members of the CSR Retirement Plan Committee (which was the trustee of the ESOP) from April 2003 until their resignations in December 2011.  For purposes of this report I will refer to the defendants as the ESOP trustee(s) as opposed to members of the Plan Committee.

The defendants also served as the principal officers of the Company during this period.  Ms. Wain became CEO in 1987 until her resignation in December 2011, and Mr. McManus, hired by the Company in March 2000, served as CFO from 2001 until his termination in October 2012.  In addition, the defendants served as the only members of the Company's board of directors for essentially the entire period they were the ESOP trustees.

---

[1] In many of the Company documents I reviewed Ms. Wain is referred to as Ms. Aitken but in the pleadings she is referred to as Ms. Wain.

3

My report concludes that the defendants in their fiduciary roles as ESOP trustee and as board members failed to perform prudent oversight of the board and Company officers and this breach of their fiduciary duties allowed the defendants to engage in self-dealing in the form of unreasonable executive bonuses paid to themselves to the detriment of ESOP participants.

I base my opinions of defendants' actions on my review of various documents provided to me by the plaintiffs and their counsel.  The documents on which I rely are more particularly described in this report.  I may find it appropriate to revise or supplement my opinions, analysis, and conclusions stated herein in the future.

## II.    Qualifications

My name is Paul Horn, President of Workplace Consultants, LLC.  I have worked in the employee benefits field since beginning my legal career with the Internal Revenue Service ("IRS") Office of Chief Counsel in 1983.  While there I litigated retirement plan cases before the Tax Court, worked on tax rulings, and coordinated IRS positions with other government agencies such as the Pension Benefit Guaranty Corporation ("PBGC"), Department of Labor ("DOL"), Department of Justice ("DOJ"), and Equal Employment Opportunity Commission ("EEOC").

I left the IRS in 1987 to work on employee benefit and retirement plan matters at major law firms in San Francisco (Pillsbury, Madison & Sutro) and Washington, D.C. (Groom & Nordberg).  I returned to government service in 1993 as Federal Deposit Insurance Corporation ("FDIC") Benefits Counsel, serving as the national coordinator for all employee benefits and tax matters involving FDIC bank receiverships.

Following completion of my term appointment at the FDIC, I joined American Systems Corporation ("ASC") in 1996, where I had responsibility for all benefit and compensation programs.  I played a key role in ASC's transition to one of the country's largest 100% S Corp. ESOP companies in 1998.  I drafted all ESOP communications, advised the

4

ESOP's internal fiduciary on all ESOP operational matters, and supervised the work product of the ESOP's third party administrator.

In 1997 I was elected an officer of The ESOP Association's Mid-Atlantic Chapter (covering Maryland, Virginia, District of Columbia, and West Virginia) and subsequently served as Chapter President for six years. I was named ESOP Chapter Officer of the Year in 2003. I remain an officer of the Mid-Atlantic Chapter responsible for Chapter programming.

I formed WorkPlace Consultants, LLC in 2007. In my practice I assist clients with their ESOP and benefits-related issues. Regarding professional affiliations, I have since served as (a) Chair of The ESOP Association's Ownership Culture Committee, (b) a member of The ESOP Association Board of Governors, (c) a member of the Employee Ownership Foundation Board of Trustees, and (d) a member of the National Center for Employee Ownership ("NCEO") Board of Directors. I currently serve as Chief Judge for The ESOP Association's Annual Awards in Communication Excellence ("AACE"). I am a frequent author and speaker on ESOPs and other benefits topics (see Appendix A).

WorkPlace Consultants, LLC currently serves as the external ESOP trustee for five companies. These ESOPs range in ownership percentage from a minority interest to 100% ownership. WorkPlace Consultants, LLC also has served as an independent ESOP transactional trustee in both the formation and termination of several ESOPs. I also sit on the board of directors of Federal Schedules, Inc., a 100% ESOP company.

I received a BA in mathematics with a minor in business from the State University of New York at Binghamton (1980), graduated from Boston University School of Law (1983), and earned a Master of Laws in Taxation from Georgetown University Law School (1987).

I am a member of the Massachusetts and California Bars, and also have earned the SPHR certification from the Society for Human Resource Management. Appendix A contains

my Curriculum Vitae as well as publications authored over the last ten years and my speaking engagements on ESOP topics since 2008.

### III.   Summary of Opinions Rendered

The ESOP trustee has a fiduciary duty under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), to act <u>solely</u> in the interests of ESOP participants and to act <u>prudently</u> when undertaking any action that affects their interests.

This means an ESOP fiduciary must act (1) free from any conflict of interest, (2) with undivided loyalty to ESOP participants, and (3) as a prudent expert when considering and taking ESOP-related actions.

The ESOP trustee is a fiduciary and in its role as a company shareholder must perform certain ongoing actions in conformance with these fiduciary duties to protect the ESOP's investment as a company shareholder and the interests of ESOP participants.  These ongoing actions include (1) the election of the members of the company's board of directors, and (2) the oversight of the board's actions.

These fiduciary duties assume even greater importance when the ESOP trustee is the principal company shareholder and controls the composition of the board.  The defendants as the ESOP trustee did <u>not</u> act as prudent ERISA fiduciaries in (1) selecting themselves as the sole board members of CSR, and (2) then not monitoring their actions as board members regarding the payment of excessive executive bonuses to themselves as officers of CSR.

A company's board of directors also is an ERISA fiduciary with respect to its selection and appointment of the ESOP trustee.  As such, the board has a duty to act prudently in making and monitoring this trustee selection.  The defendants as CSR board members did not act as prudent ERISA fiduciaries in appointing only themselves to serve as the ESOP trustee and then failing to monitor their subsequent performance as trustee.  The board of

6

directors also failed to satisfy their fiduciary duties to the ESOP and its participants under state corporate law by making excessive bonus payments to themselves as the officers of the Company.

Given the above, it is my considered opinion that the actions of the defendants were a breach of their fiduciary duties because they (1) purposefully created this overlapping, conflicted arrangement between the trustee and the board, (2) used this arrangement to engage in self-dealing contrary to their duty of loyalty to ESOP participants, and (3) failed to act as prudent experts in exercising their fiduciary duties (a) under ERISA as the ESOP trustee in its oversight of the board, and (b) as board members (i) under ERISA in appointing the ESOP trustee, and (ii) under state law in failing to represent the interests of the ESOP and its participants. These purposeful failures allowed the defendants to make ongoing payments of unreasonable and excessive compensation to themselves as officers of the Company to the detriment of ESOP participants.

**OPINION 1:** The defendants failed to act as prudent fiduciaries by purposefully creating an inherent conflict of interest that lacked any oversight and permitted self-dealing through the payment of excessive bonuses to themselves as Company officers.

**OPINION 2:** A prudent ESOP company board member would have prevented this self-dealing arrangement by either (1) not having an identity of interest between the ESOP trustee and the board, or (2) retaining an external independent ESOP trustee.

**OPINION 3:** A prudent ESOP trustee would have prevented this self-dealing arrangement by requiring that one or more disinterested individuals serve on the Company's board of directors.

**OPINION 4:** A prudent ESOP trustee would have required evidence that the executive bonus payments authorized by the board were reasonable via documentation from either (1) a compensation consultant, or (2) a recent market compensation survey.

**OPINION 5:** A prudent ESOP trustee would have made further inquiry and taken remedial action in response to the repeated statements in CSR's ESOP valuation reports that the executive bonuses paid to the Company's officers were excessive.

**OPINION 6:** A prudent ESOP trustee would have made further inquiry and taken remedial action in response to repeated Company financial statements showing that executive bonuses paid to officers were treated as "non-allowable" expenses.

**OPINION 7:** A prudent ESOP trustee would have monitored the actions of a co-trustee and taken remedial action vis-à-vis the co-trustee if the co-trustee's actions constituted a breach of fiduciary duties.

**OPINION 8:** A prudent board of directors would not have authorized excessive bonus payments to themselves as the Company officers because such self-dealing constituted an impermissible personal benefit to the detriment of the Company which violated their state corporate law fiduciary duties to the ESOP as the Company shareholder.

## IV.   Basis for these Opinions

**OPINION 1:** The defendants failed to act as prudent fiduciaries by purposefully creating an inherent conflict of interest that lacked any oversight and permitted self-dealing through the payment of excessive bonuses to themselves as Company officers.

An ESOP is a special type of retirement plan that holds the capital stock of a company (1) purchased either from selling shareholders (typically the company founders), or (2) directly contributed by the company for the benefit of its employees.  The shares of the company's capital stock in the ESOP trust are held for the benefit of the employee participants and allocated to participant accounts under the terms of the ESOP plan document.  The ESOP trustee is subject to the same fiduciary standards as other retirement plan fiduciaries but for the requirement to diversify the investment of plan

8

assets.  The ESOP trustee can hold capital stock in the plan sponsor as the sole investment in the plan.

The ESOP trustee is responsible for managing the retirement plan trust and performing other important ongoing tasks -- such as the approval of the annual independent stock valuation report and the payment of ESOP benefits to eligible participants from the trust. These tasks require training and expertise to be performed properly and in conformance with the trustee's ERISA fiduciary duties.  There is no indication that the defendants either sought or received any training for this important role as ESOP trustees.  Nor is there any indication that the Company joined any association or organization that provided this ESOP training or guidance to members.

When making decisions as an ERISA fiduciary, the ESOP trustee has a duty to act as a prudent expert.  If the fiduciary is not an expert in a particular area, the fiduciary must seek the advice of individuals who can supply such expertise.  Actions to be performed by the ESOP trustee as a prudent expert include (1) voting company shares held by the ESOP for the election of board members, (2) monitoring the activities of the board it has put in place, and (3) taking appropriate action if the board engages in behavior detrimental to the interests of ESOP participants.  As I will explain later, the defendants failed to act prudently in fulfilling these fiduciary duties.

Under ERISA, the company's board of directors (or in some cases a delegated officer or a committee of the board) appoints the ESOP trustee.  The specific rights and responsibilities of the ESOP trustee within the ERISA framework are set forth in the ESOP trust agreement adopted by the trustee and in the ESOP retirement plan document adopted by the company.   As another example in this case of lax oversight and operation, there is no indication that the defendants, despite serving as ESOP trustee for an extended period, ever signed and formally adopted an ESOP trust agreement.

The board's selection and appointment of the ESOP trustee is itself a fiduciary act.  If, for example, the board selected a convicted felon as trustee who then embezzled trust assets,

9

the board would be culpable under ERISA for the failure to act prudently in making the trustee appointment and in monitoring the trustee's actions.  As I will explain later, the defendants failed to act as prudent fiduciaries as board members when appointing only themselves to serve as the ESOP trustee.

The standard of care that an ERISA fiduciary owes to plan participants is a higher standard than the care owed to shareholders by board members and company officers when making business decisions.  This ERISA fiduciary duty to participants has been recognized as the highest standard of care known by law.  Specifically, the fiduciary must act "solely in the interest of the participants and beneficiaries" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use..." ERISA section 404(a)(1).

Prudent fiduciary conduct means the fiduciary must engage in a prudent "process" when making decisions.  This process has two parts: (1) procedural prudence (the documentation of all relevant information when making a decision); and (2) substantive prudence (decision-making as by an expert in that substantive area).

The ESOP trustee, as the shareholder of record for the company shares held by the trust, has the responsibility to vote such shares to select board members at the company's annual shareholder's meeting.  The ESOP participants have a beneficial interest in their ESOP shares but are not shareholders of record.  Under ERISA, ESOP participants only have the right to vote their shares in limited circumstances, such as the sale of substantially all the assets of the company or a recapitalization of the company.  The election of the board of directors is not an event that requires participant voting under ERISA.

Notwithstanding the above, some companies specify in the plan and trust documents that the trustee vote ESOP shares for the election of board members at the direction of (1) an

10

internal company fiduciary committee. or (2) ESOP participants (so-called participant "pass-through" voting).  Neither of these exceptions applied here.

This trustee selection process has been described as somewhat circular when the ESOP is the majority shareholder.  This is because the ESOP trustee is appointed by the board but the ESOP trustee in turn votes its shares to elect the board of directors.  Depending on the terms of the trust and plan documents, the board may have the ability to terminate the ESOP trustee before the trustee can vote or take remedial action against the board. Regardless of such timing, an ESOP trustee still has a fiduciary obligation to "stir the pot" and not remain silent where board actions are inimical to the interests of ESOP participants – even if speaking up could result in the termination of the ESOP trustee's services.

The Company's ESOP was adopted in 1985 and acquired 92.3% of the Company's capital stock from the Company's founder in 1986.  The ESOP owned at least this percentage of the Company's capital stock during the period defendants served as the ESOP trustee.  Accordingly, the ESOP trustee, as the principal shareholder of the Company, retained the absolute power throughout this period to control the board's composition.  Despite this power to select and elect board members who could best represent the interests of ESOP participants, the defendants purposefully used this "circularity" of appointment to create an inherent conflict of interest by serving as sole ESOP trustee and board members.  This arrangement, of course, removed any independent oversight of their actions as board members.[2]

This purposefully conceived arrangement, devoid of any governance oversight or safeguards, allowed the defendants to engage in ongoing self-dealing for their own benefit.  As the sole board members and senior company officers, the defendants could decide their total compensation as officers without any oversight or review.

---

[2] Laurel Robinson was hired as company president and also joined the Company's board in January 2003.  However, her tenure was extremely short-lived as she resigned soon after the defendants appointed themselves as the ESOP trustee on April 17, 2003.

11

It is important to contrast the absence of duties required of shareholders under state corporate law with the substantial duties of an ESOP trustee as a shareholder under ERISA. While an individual majority shareholder may have limited obligations to minority shareholders under state law, typically the shareholder has no obligation or duty to monitor or safeguard its own investment. The individual can choose to be "asleep at the switch" and not enforce its rights while a company board and its officers engage in self-dealing. In sharp contrast, a shareholder cannot be similarly asleep when holding the same shares for the benefit of another, for example, as an ESOP trustee holding the shares as fiduciary for the benefit of the ESOP participants.

It also is important to note that the same individuals certainly are not prohibited from being the company shareholders, board members, and company officers. However, if these overlapping interests result in self-dealing in a non-ESOP company, only the self-dealing shareholders are the ones harmed. They would not as the sole shareholders have a cause for damages for their improper actions as board members and officers.

It similarly is true that nothing prohibits the same individuals from serving in these three roles at an ESOP company. However, this ESOP "trifecta" can be highly problematic and ripe for self-dealing when only these same individuals wear all three hats. In this situation, there is no disinterested oversight of the board by the ESOP trustee as shareholder to prevent self-dealing and look out for the interests of ESOP participants.

As the principal company shareholder, a prudent ESOP trustee is in the position to monitor board actions such as the authorizing of executive bonuses. Where such bonuses are labeled as excessive by an ESOP valuation report or clearly called into question by a compensation consultant's report, the ESOP trustee has a fiduciary duty to take corrective action. Such action can include recoupment of the excess payments, recomposing the board, or other legal action. Failure to take any corrective action is a breach of the trustee's fiduciary duty. Of course, since the defendants appointed themselves as the ESOP trustee, no monitoring or corrective action vis-à-vis the board compensation process would ever occur.

12

The arrangement conceived by defendants allowed for self-dealing without any attendant "checks and balances" to prevent their using the Company as a personal checking account. Using an apt phrase from a childhood fable, the defendants as the board members selecting themselves as ESOP trustee became the "fox guarding the chicken coop" with no one to warn the ESOP participants in the chicken coop of the self-dealing.

Given the clear conflict created by defendants in this arrangement, any trustee or board action either directly or indirectly benefiting the defendants would require documentation showing the action remained solely in the interests of ESOP participants. The defendants have no documentation indicating that their decisions regarding the payment of executive bonuses to themselves were made with undivided loyalty to ESOP participants. To the contrary, the applicable documentation from (1) a consultant's compensation study, (2) numerous valuation reports, and (3) treatment on financial statements as a non-allowable expense shows that defendants knew that the executive bonuses were excessive and, therefore, could not possibly be in the best interests of ESOP participants.

The defendants easily could have avoided this conflict of interest and potential for self-dealing by <u>not</u> serving as the ESOP trustee, sole board members and principal officers. Having the same persons serve in all these roles is considered so ripe for self-dealing and resultant harm that many insurers are reluctant to even provide fiduciary insurance for the company and the ESOP where this trinity of overlapping interest exists. Due to the same concerns, where bank financing is used by the ESOP to purchase shares, the lender often will require an independent trustee and that at least one or more outside directors be added to the board as a condition to closing.

**OPINION 2:** A prudent board member would have removed the potential for self-dealing by either (1) not having an identity of interest between the ESOP trustee and the board, or (2) retaining an external independent trustee.

13

The defendants as the Company board members appointed themselves as the sole ESOP trustee. In turn, as the ESOP trustee and principal shareholder of the Company they reflexively kept themselves ensconced as the sole board members. By doing this, they removed any possibility that the ESOP trustee could exercise independent oversight and governance of their actions as the only Company board members.

To remove this conflict and recipe for self-dealing, it would have been prudent for the defendants as board members to have selected either (1) one or more disinterested individuals (other employees or outsiders) to join them as an ESOP trustee, (2) only disinterested Company employees to serve as the ESOP trustees, or (3) an external, independent person or institution to serve as the ESOP trustee. The defendants, of course, took no such prudent steps because the presence of a disinterested party as an ESOP trustee would have shed undesirable light on their executive bonus payment practices.

More ESOP companies have realized that the important role of ESOP trustee with its corresponding ERISA fiduciary duties should be performed by a competent, independent outside party. While small ESOP companies may be concerned about the cost of an external trustee, the use of an external trustee (or at least one outside member for the trustee committee) is becoming more common due to concerns regarding both competency and conflicts of interest for the trustee. Where an internal ESOP trustee committee is used, the National Center for Employee Ownership ("NCEO") 2012 survey of 501 companies on ESOP governance practices states that the internal committee most commonly (more than 50% of respondents) has at least three members.

It also is increasingly common practice (1) for those employees selected to serve as an ESOP trustee to receive training in their fiduciary duties and how to review a valuation report, and (2) for these employees to include non-officers to minimize the potential for conflicts of interest and self-dealing.

14

The defendants took none of the above prudent actions as the Company board members in structuring the internal committee serving as the ESOP trustee. Instead, they chose themselves to serve as the <u>only</u> members of the CSR Retirement Plan Committee ("Committee"), the body they created as board members to act as the ESOP trustee. Highlighting this self-serving arrangement was the Committee's formation in April 2003 following the defendants' decision as board members to terminate the ESOP's independent ESOP trustee, Neuberger Berman. Without an independent trustee to provide oversight as the principal shareholder, the defendants were able to create a corporate governance structure which allowed them to use the Company's checking account as their own.

As previously noted, there is no evidence that the defendants received any training or education regarding their fiduciary duties as board members or as the ESOP trustee. The absence of such training and any prudent oversight, however, by the defendants as board members or ESOP trustee is shown by the lack of formal documentation for customary ESOP trustee meetings where such important functions like acceptance of the annual share price or the voting of ESOP shares for the election of the members of the board of directors would have been memorialized.

**OPINION 3:**  A prudent ESOP trustee would have removed this self-dealing arrangement by requiring that one or more disinterested individuals serve on the Company's board of directors.

Where the ESOP trustee is the principal shareholder and has the ability to control the composition of the board of directors, it is common practice for the ESOP trustee to require that one or more outside directors serve on the board. This is because outside directors provide both desirable expertise and serve without the inherent conflict of interest that applies to individuals who are also shareholders or officers of the company.

Outside board members typically serve on important board committees that are created to remove the conflicts of interest which typically exist for inside board members when

15

making decisions in critical operational areas such as officer compensation, audit, finance, nomination, and governance.

With the enactment of recent laws like Sarbanes-Oxley in 2002 and Dodd-Frank in 2010, public companies are required to comply with extensive governance requirements to make company directors and officers properly accountable to shareholders. The concept of director "independence" has become increasingly important in corporate governance under these laws and has been defined, for example, in rules adopted by the Nasdaq and the New York Stock Exchange. These rules also have become regarded as "best practice" for private companies. The Nasdaq rules generally require that independent directors make up a majority of the members of the board of directors and the audit committee consist of at least three independent directors. Executive compensation and director nominations must be approved by either a committee of independent directors or a majority of the independent directors on the board. The independent directors also must have regularly scheduled executive sessions at which only they attend.

As noted above, a private ESOP company is not subject to the same corporate governance requirements laws applicable to public companies. However, a private company whose principal shareholder is an ESOP bears more attributes of a public company than of a private company owned by an individual. Unlike the private business owned by one individual, the directors and officers of an ESOP-owned company are instead accountable to a broad group of beneficial owners – i.e., the ESOP participants. Accordingly, many majority ESOP-owned companies have instituted corporate governance procedures that are more similar to those of public companies than to traditional private companies.

These ESOP company board practices are intended to support a corporate governance model that can be effectively exercised to protect the interests of the ESOP participants. For example, results from the 2012 NCEO corporate governance survey indicate it is common practice for ESOP trustees who are majority shareholders to require that the board have at least one, and often a majority, of outside members. Even for smaller

16

ESOP companies with under $50M in revenue, a majority (54%) had at least one outside director and more than 80% had three or more board members.

Similar use of outside directors was reflected in the earlier 2009 NCEO governance survey of 190 ESOP companies, almost all with under 500 employees. As more ESOPs became majority or 100% owners to secure the advantages of the 1997 tax law changes allowing ESOPs to be S-Corporation shareholders, more ESOP companies began having outside directors. The 2009 survey stated that about 75% of respondents used at least one external director, either an outside director or one who was affiliated with the company but was not an employee (e.g., a supplier or vendor).

Not surprisingly, the survey showed that the outside board member typically headed the compensation committee which would make decisions on officer compensation. About 70% of all ESOP companies responding had board committees with the most common, again no surprise, being the compensation/personnel committee. The survey also found that as part of the trend of growing governance oversight, it was becoming more common for the ESOP trustee to require written guidelines for director performance and review.

The defendants as the ESOP trustee did not pursue the prudent practice of having one or more outside board members join them on the board. The defendants also did not seek to have any other employees join them on the board (except for the brief period noted). The defendants did not engage in these prudent practices followed by other majority ESOP companies because having an outside or additional director would have subjected their executive bonuses to scrutiny. Such scrutiny would have significantly reduced the likelihood of the excessive executive bonuses being paid.

**OPINION 4:** A prudent ESOP trustee would have required evidence that the executive bonus payments authorized by the board were reasonable via documentation from either (1) a compensation consultant, or (2) a recent market compensation survey.

17

As noted in the NCEO surveys, some small ESOP companies, even though majority-owned by the ESOP, still may not have outside board members.  This may be because the company leaders (1) are leery of yielding any control to outsiders, (2) believe the cost of paying outside board members is an unneeded expense, (3) cannot or have yet to find suitable outside board members, or (4) all or some of the above.   Nonetheless, even if the ESOP trustee as majority shareholder does not require outside or additional inside board members to protect its interests, a prudent ESOP trustee still has a duty to monitor board actions and the reasonableness of the board compensation decisions made for officers.

A prudent ESOP trustee must act as an expert and, therefore, would require evidence that the total compensation paid to officers was in line with industry standards as supported by a compensation consultant or a recent compensation survey.   A further safeguard used by a prudent ESOP trustee is to have the board reflect the above findings in employment agreements with the officers that set forth and limit their compensation.  No ongoing employment agreements were produced that limit defendants' pay or tie it to some Company financial benchmark.

Further financial Company background for fiscal years ending 9/30/2000 through 9/30/2011, relevant to this issue includes:

- Gross revenues ranged from $6.5M to $10.2M.
- The workforce averaged about 60 employees.
- Defendants paid solely to themselves aggregate executive bonuses of $5.2M, an amount which constituted 98.5% of the company's pre-tax income for these years (and actually approaches 100% of pre-tax income when the additional 1.45% Medicare tax paid by the employer on such amounts is added thereon).

The total pay to defendants involved three pieces:  (1) base salary, (2) the lump sum bonus, and (3) the executive bonus.  The base salaries for defendants were not outsized compared with other employees and industry standards.  These amounts ranged from $110,000 to $176,400 for Wain for the period 2000 thru 2011, and from $83,000 to $156,700 for McManus (we ignore his first partial year of employment).

18

Similarly, their lump sum bonuses for this period were not immodest, ranging from $32,000 to $52,920 for Wain and $5,000 to $15,670 for McManus. Importantly, many other employees (sometimes close to half the full-time workforce) were eligible for and paid a lump sum bonus during this period. One or two employees actually received a larger lump sum bonus than McManus for some years.

The executive bonus payments, on the other hand, are a completely different story. These bonuses far exceeded the amount of the lump sum bonuses and were paid <u>only</u> to the defendants. Moreover, unlike the lump sum bonuses paid immediately to recipients, the executive bonuses were paid in deferred fashion with a Company promissory note given to the defendants. This likely was done to lessen the negative impact the very large bonuses would have on the Company's cash flow. Adding insult to injury, the promissory notes often contained a provision to pay significant interest to defendants -- up to 5% interest on these installments.

The executive bonuses were authorized annually by the defendants -- either at a board meeting or through a board resolution via unanimous consent in lieu of a meeting. In fact, it appears that few formal board meetings occurred after 2002 and all subsequent salary and bonus decisions were made via unanimous board consent. This annual approval pattern was quite similar: a brief resolution in October approving any changes in employee base salaries followed by a brief resolution in December approving both the lump sum and executive bonuses. No justification based on business performance or other factors for the high level of the executive bonuses is contained in the board documents.

The defendants cannot feign ignorance of the excessive nature of their executive bonuses. One reason they cannot do so is the five-page letter from T.R. Edgar & Associates to McManus, dated September 15, 2003, that provides average compensation data for similar CEO and CFO positions for the period 2000 – 2003 based on up to six local and national surveys.

19

The T.R. Edgar & Associates letter states that "we selected the averages/medians most representative of a match with CSR." The data reported is as follows (rounded) and is contrasted with the total compensation (which includes the executive bonuses) actually paid to the defendants:

| FYE | Survey CEO Total Comp* | Wain Total Comp | Survey CFO Total Comp | McManus Total Comp |
|------|------|------|------|------|
| 2000 | $180,000 | $518,000 | $128,000 | $139,781** |
| 2001 | $196,000 | $651,875 | $133,000 | $308,075 |
| 2002 | $191,000 | $409,000 | $155,000 | $204,700 |
| 2003 | $216,500 | $421,500 | $166,000 | $235,500 |

\* Average rather than median total compensation used by consultant for 2000.
\*\* McManus was hired mid-way through the year.

A prudent ESOP trustee looking at this data quickly would conclude that the total compensation being paid to the defendants was far in excess of the median amounts being paid to officers at companies of similar size. To justify such payments, the ESOP trustee would need clear substantiation that the payments (1) represented the superior performance of the Company attributable to the efforts of the defendants, or (2) were consistent with  Company policy and performance that similarly rewarded other officers and employees with substantially above median pay.  In the absence of such justification, the ESOP trustee would have the duty to protect the interests of ESOP participants by preventing the board of directors from approving such excessive payments.

Despite this "smoking gun" letter from a consultant hired by McManus to conduct this compensation survey, the defendants continued authorizing significant executive bonuses only for themselves.  As ESOP trustees, the defendants were aware of this survey data but conveniently chose to ignore it with regard to the oversight of their behavior as board members in authorizing these payments.

20

OPINION: a prudent ESOP trustee would have made further inquiry and taken remedial action in response to the repeated statements in the ESOP valuation reports that the executive bonuses paid to officers were excessive.

An ESOP is required to have an annual appraisal of the value of the shares of the company's capital stock held by the ESOP trust. The appraiser is engaged jointly by the company and the ESOP trustee to provide this report to the trustee. An ESOP trustee has an obligation to be familiar with the report contents and to document its diligent review thereof. It cannot simply rubber stamp the report.

The reports for the period at issue clearly state that the executive bonuses paid were "excessive" and that the excess needed to be added back to "normalize" the Company's net cash flow. This adding back to cash flow occurs because the appraiser assumes that a 3rd party buyer would <u>not</u> continue the excessive payments.[3]

The valuation reports generally determine the excess amounts as a percentage of the Company's revenue. For example, in the 2010 report the total pay to the defendants was $725,674 and the appraiser concluded that only $385,674 was reasonable. Thus, the entire difference of $340,000 (representing the executive bonus) was considered excessive and was added back to net cash flow as a material adjustment to earnings. SRR, the appraiser, used 5.1% of 2010 Company revenue as a metric for reasonableness of executive pay based on the Risk Management Association study of officer pay in companies with the same SIC code as the Company.

SRR also cited to the Economic Research Institute study showing executive pay as a percentage of gross revenue for the <u>top six paid executives</u> ranged from 3.2% to 9.1% for

---

[3] Defendants might argue that ESOP participants suffered no direct harm because the excess compensation cost was "normalized" and share value was not directly decreased by the executive bonuses. This argument is incorrect, however, because the excess cash that left the Company could have increased share value in other ways. For example, the cash retained by the Company could have reduced working capital needs, been added back separately to the valuation as excess cash reserves, or used to fund the ongoing ESOP repurchase liability which is significant in a 100% ESOP company.

21

companies the same size as CSR.  The total pay to just the two defendants alone in 2010 was 9.3% of revenue, thus exceeding even the upper limit of the range for the top six executives reported in the study.

The executive bonus deemed excessive by the valuation report for each year is shown below.

| FYE | Total Executive Bonus | Executive Bonus Deemed Excessive | Executive Bonus Not Treated as Excessive |
|---|---|---|---|
| 2000 | $470,000 | $170,000 | $300,000 |
| 2001 | $721,250 | $421,251 | $300,000 |
| 2002 | $370,000 | $70,000 | $300,000 |
| 2003 | $389,500 | $89,500 | $300,000 |
| 2004 | $305,000 | $230,000 | $75,000 |
| 2005 | $318,500 | $150,000 | $168,500 |
| 2006[4] | $810,300 | $600,000 | $210,300 |
| 2007 | $548,402 | $400,000 | $148,402 |
| 2008 | $333,263 | $340,000[5] | 0 |
| 2009[6] | 0 | 0 | 0 |
| 2010 | $340,000 | $340,000 | 0 |
| 2011 | $625,000 | $530,000 | $95,000 |
| Total | $5,231,215 | $3,340,751 | $1,897,202 |

There is no indication that the defendants carefully reviewed or questioned any specific content of the reports.  A prudent ESOP trustee would have carefully read the report and been made aware that substantial compensation being paid to officers (who also were the sole board members) was considered excessive by an outside "expert," in this case the ESOP appraiser.  A prudent ESOP trustee then would have made further inquiry to the

---

[4] SRR became the new ESOP appraiser.  Valumetrics was the appraiser through the 2005 plan year (it was acquired by Duff & Phelps in 2005) and it used $300K as metric for compensation reasonableness.  SRR determined the excess amounts for 2004 and 2005 used in the above table in performing its 2006 report.
[5] Amount of total pay deemed excessive exceeded the executive bonus.
[6] Company had net loss for 2009 and no executive bonus was paid.

board to substantiate the reasonableness of these payments. The defendants made no
such demand on the board to substantiate the reasonableness of the payments.

**OPINION 6:** A prudent ESOP trustee would have made further inquiry and taken
remedial action in response to Company financial statements showing that executive
bonuses paid to officers were being treated as "non-allowable" expenses.

A prudent ESOP trustee would review a company's financial statements in connection
with its review of the valuation report. Here the Company's financial statements
uniformly showed the executive bonuses were treated as non-allowable expenses,
meaning the Company did not include these bonus payments in calculating the overhead
rates charged to its clients.

To provide competitive benefits to employees, many government contractors include a
modest charge for a bonus pool in their overhead rates. The cost for the lump sum bonus
pool was built into CSR's overhead rate. On the other hand, the executive bonuses were
not similarly billed. Instead, they represented payments directly out of the Company's
profits (and as noted previously representing substantially all Company profits). This
exclusion occurred because including the significant executive bonuses in the overhead
rates would have made the Company's rates non-competitive in the industry.

Having the executive bonus payments characterized as non-allowable costs on the
financial statements should have been a red flag to a prudent ESOP trustee to investigate
these payments further. The defendants did not engage in any such inquiry since the
non-allowable payments were to themselves.

**OPINION 7:** A prudent fiduciary would have monitored the actions of a co-fiduciary
and taken remedial action if the actions of the co-fiduciary constituted a breach of
fiduciary duties.

23

A fiduciary is liable for its own actions as well as, in certain circumstances, for the actions of other plan fiduciaries. In other words, you must be vigilant both as to your own conduct as a fiduciary as well as the conduct of your co-fiduciaries. Co-fiduciary liability is essentially a version of joint and several liability.

Co-fiduciary liability will attach to a fiduciary if the fiduciary "enables the other fiduciary to commit a breach; or has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances, to remedy the breach." ERISA Section 405(a). A fiduciary has an affirmative obligation to investigate suspected breaches committed by a co-fiduciary if it would be reasonable and prudent under the circumstances to do so based on the suspicion that the co-fiduciary has (by omission or commission) has engaged in a breach of fiduciary duty.

The defendants were each individually fiduciaries through their positions as ESOP trustees and board members. Therefore, they had the duty to monitor the fiduciary behavior of the other. As discussed previously, since the defendants colluded and acted collaboratively both as ESOP trustees and as board members they were aware of the actions they each performed. Accordingly, under ERISA each is liable for the fiduciary breaches committed by the other.

**OPINION 8:** A prudent board of directors would not have authorized excessive bonus payments to themselves as company officers because such self-dealing constituted an impermissible personal benefit to the detriment of the company that violated their state corporate law fiduciary duties to the ESOP as the company shareholder.

The board of directors represents the interests of the corporation's shareholders. It has a fiduciary duty under state corporate law to act in the best interests of the corporation and these shareholders. Company officers have similar fiduciary duties to shareholders.

24

A board member's fiduciary duty under state law can be stated simply as a legal duty to act towards the corporation with (1) care, and (2) undivided loyalty.

The duty of care requires that directors discharge their duties both in (1) good faith, and with (2) the care that an ordinarily prudent person in a like position would exercise under similar circumstances. This corporate fiduciary duty is a lesser standard than the ERISA prudent "expert" standard but, as discussed below, was still not satisfied by the defendants.

The duty of loyalty requires the director to act in the best interests of the corporation and shareholders and to refrain from self-dealing that would confer a personal benefit for that director detrimental to the interest of the shareholder.

The "business judgment rule" may protect directors from liability for their actions, even if the actions turn out be bad business decisions, but only if the directors acted consistent with their above-described duties. On the other hand, the business judgment rule does not provide protection to a director who failed to act in good faith because of self-dealing benefiting the director to the detriment of the corporation.

These above general fiduciary standards have been largely codified under Virginia law. The Virginia Stock Corporation Act (effective Jan. 1, 1986) amended Title 13 of the Code of Virginia to provide in relevant part as follows (italics added for emphasis):

> § 13.1-690. General standards of conduct for director.
>
> A. A director shall discharge his duties as a director, including his duties as a member of a committee, *in accordance with his good faith business judgment of the best interests of the corporation.*
>
> B. Unless he has knowledge or information concerning the matter in question that makes reliance unwarranted, *a director is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data,* if prepared or presented by:
>
> 1. One or more officers or employees of the corporation whom the director believes, in good faith, to be reliable and competent in the matters presented;

25

2. Legal counsel, public accountants, or other persons as to matters the director believes, in good faith, are within the person's professional or expert competence; or

3. A committee of the board of directors of which he is not a member if the director believes, in good faith, that the committee merits confidence.

§ 13.1-691. Director conflict of interests.

A. A conflict of interest transaction is a transaction with the corporation in which a *director of the corporation has an interest that precludes the director from being a disinterested director.* A conflict of interest transaction is not voidable by the corporation solely because of the director's interest in the transaction if any one of the following is true:

1. The material facts of the transaction and the director's interest *were disclosed or known to the board of directors or a committee of the board of directors and the board of directors or committee authorized, approved, or ratified the transaction;* or

2. The material facts of the transaction and the director's interest *were disclosed to the shareholders entitled to vote and they authorized, approved, or ratified the transaction;* or

3. The transaction was *fair to the corporation.*

The defendants as board members failed to act prudently and consistently with their fiduciary duties under Virginia law. It is axiomatic that directors must have an absence of personal financial interest in the matters before them. If the potential for divided loyalty exists for the board member, at a minimum the board member must disclose the conflict, defer to the decision of non-conflicted board members, and abstain from the decision-making process. The disinterested board members can still approve an action that benefits the abstaining member if the non-conflicted members can substantiate why the action is also in the best interests of the corporation.

The defendants clearly failed to satisfy their duties as board members under Virginia law by not adhering to the above-mentioned safeguards in authorizing the payment to themselves of excessive bonuses.

- They failed to add any independent board members who could have reviewed or authorized their actions.

26

- They provided no documentation in board minutes or otherwise that the payments were made in the best interests of or were fair to the Company.

- They did not show any reliance on third party information to substantiate that the payments were reasonable. In fact, as discussed previously, they ignored clear third party information that the payments were excessive.

This self-dealing exclusively benefited defendants and was detrimental to the Company and the ESOP as shareholder. Accordingly, the defendants violated their fiduciary duty as directors under Virginia law to the ESOP as shareholder.[7]

## V.      Information Considered

1.      Complaint John Foster-Bey and CSR, Inc. vs. Wain and McManus
Civil Action No. 1:13CV1382, U.S. District Court, Eastern District of Virginia
(Alexandria Division), filed Nov. 8, 2013

2.      Motion to Dismiss for Failure to State Claim

3.      Memorandum in Support of Motion to Dismiss for Failure to State Claim

4.      Opposition to Motion to Dismiss for Failure to State Claim

5.      Response in Support of Opposition to Motion to Dismiss for Failure to State Claim

6.      CSR Board of Director Meeting Minutes
   a.      12-13-2001
   b.      12-10-2002
   c.      12-9-2003

---

[7] If the objective of the payments was to minimize the double taxation associated with being a C Corporation, this objective could have been stated in the Board minutes and, in all events, more equitably achieved by paying out the additional bonus to a wide cross section of employees, not just the two defendants. Since the ESOP was essentially the only shareholder, it also is not clear why defendants did not seek to minimize taxes on corporate earnings by converting the company to an S Corporation. Since the ESOP is a tax-exempt retirement plan, its share of S Corporation earnings are not subject to tax and no distribution need be made by the Company to the ESOP to pay any taxes. This increases Company cash flow by the amount of the foregone taxes and such accumulated tax savings also can enhance the Company's valuation.

       d.     12-10-2004
       e.     8-16-2011

7.    CSR Board of Director Resolutions
       a.     10-8-2003
       b.     10-12-2005
       c.     11-29-2005
       d.     10-12-2006
       e.     12-1-2006
       f.     10-17-2007
       h.     12-11-2007
       i.     10-13-2008
       j.     12-9-2008
       k     10-21-2009
       l.     11-09-2009
       m.     12-09-2009
       n.     6-8-2010
       o.     10-19-2010
       p.     11-1-2010
       q.     12-2-2010
       r.     10-19-2011
       s.     11-1-2011
       t.     11-17-2011
       u.     12-2-2011

8.    T.R. Edgar & Associates Letter (9-15-2003)

9.    ESOP Valuation Reports
       a.     PYE 2002
       b.     PYE 2003
       c.     PYE 2004 (cover letter only)
       d.     PYE 2006
       e.     PYE 2007
       f.     PYE 2008
       g.     PYE 2009
       h.     PYE 2010
       i.     PYE 2011
       j.     PYE 2012
       k.     PYE 2013

10.   Spreadsheets of executive bonuses paid prepared by Bean, Kinney & Korman, P.C.

11.   CSR Board of Director Resolutions re ESOP amendments
       a.     10-1-2002 w/ signed amendment
       b.     4-18-2003

      c.     undated/unsigned 2004

12.    CSR ESOP Plan Committee Minutes
      a.     3/25/03   Seeley claim denial
      b.     March 2003 McKey claim denial

13.    4-1-14 letter from McManus to Aitken re "Gerry Williams" 5-year separation from service issue

14.    Neuberger Berman
      a.     4/17/03 letter from McManus to Neuberger terminating their services as ESOP trustee
      b.     CSR ESOP Plan Committee Minutes same date terminating Neuberger
      c.     Trust agreements for ESOP and MPPP with Neuberger (unsigned)

15.    McManus
      a.     One-year employment agreement with McManus ending 12/31/02
      b.     Offer letter of 2/7/2000 to McManus

16.    ESOP contributions and distributions for period 2002 - 2012

## VI.    Compensation

I have been engaged to perform these services by CSR at the rate of $350/hour.

## VII.    Cases

I have not been certified as an expert witness in a case in Federal Court or a state court within the past four years.

## VIII.    Signature

I declare, under penalty of perjury, under the laws of the United States of America that the foregoing is true and correct. Signed this 9th day of July 2014, in Bethesda, MD.

Paul S. Horn
President, WorkPlace Consultants, LLC

29

**APPENDIX A**

<u>Curriculum Vitae</u>

**Experience**

| | | |
|---|---|---|
| *WorkPlace Consultants, LLC* | *President* | *2007 to Present* |

- Provide responsive, pragmatic and cost-effective customer solutions to employee benefit problems.
- Serve as ESOP trustee in numerous transactions as well as in ongoing capacity.

| | | |
|---|---|---|
| *American Systems, Chantilly, VA* | *Director, Benefits* | *1996 to 2007* |

Managed benefit programs and vendors for multi-site government contractor with 1,500 employees

- Designed and installed new 401(k) plan with greater fund choices and reduced fees; supervised termination and asset transfers from acquired company retirement plans.
- Drafted plan amendments, resolutions and related documents for Board review and assisted plan trustees on fiduciary compliance for ESOP and 401(k) plans.
- Created due diligence and comparative review analysis process for benefits programs of acquired companies.
- Drafted company procedures on FMLA, COBRA, HIPAA, ERISA, and FLSA issues.

| | | |
|---|---|---|
| *Internal Revenue Service, Washington, DC* | *Senior Attorney* | *1983 to 1987* |
| *Pillsbury, Madison & Sutro, San Francisco, CA* | *Associate* | *1987 to 1989* |
| *Groom & Nordberg, Washington, DC* | *Associate* | *1990 to 1993* |
| *Federal Deposit Insurance Corp., Washington, DC* | *Counsel* | *1993 to 1996* |

- Advised clients on benefits, tax, labor and plan administration issues under ERISA, IRC, ADEA, ADA and SEA.
- Drafted and designed ERISA plans and stock-based compensation arrangements.
- Served as national coordinator for employee benefits/tax matters involving FDIC bank receiverships.
- Litigated employee benefits cases for IRS.
- Coordinated IRS positions with the DOJ, DOL, PBGC, and EEOC.

**Education**

| | |
|---|---|
| **Legal:** | <u>Georgetown University Law Center</u>, Washington, DC |
| | LL.M. in Taxation, February 1987 |
| | |
| | <u>Boston University School of Law</u>, Boston, MA |
| | J.D., May 1983   J. Joseph Tauro Scholar |
| | |
| **Undergraduate:** | <u>State University of New York at Binghamton</u> |
| | B.A., Mathematics   Minor: Accounting   May 1980 |

30

## PROFESSIONAL MEMBERSHIPS & ACHIEVEMENTS

· Member, Massachusetts and California Bars
· Member, National Center for Employee Ownership
· Member, The ESOP Association
  Retirement Planning Award, Honorable Mention (Nov. 2001 / Benefits News)
  FDIC Merit Performance Award, 1995
  IRS Chief Counsel Performance Award, 1985 and 1987
  SPHR Certification, Society for Human Resource Management (SHRM)

### Publications and Speaking Engagements

**Publications for Past Ten Years**

- **Communications Sourcebook,** *NCEO Publication, Co-editor, (March 2013)*
- **Understanding and Communicating ESOP Valuations,** *NCEO Publication, (April 2012)*
- **Long-Term Incentive Plans for ESOP Companies,** *NCEO Publication, Co-editor (Sept. 2012)*
- **S Corporation ESOP  Traps for the Unwary,** *NCEO Publication, Co-editor (Nov. 2011)*
- **ESOP Distribution Policies,** *NCEO Publication, Co-editor (June 2010)*
- **People AND Profit: Communicating the Value of Shared Capitalism Through ESOPs,** *ESOP Assoc. Bulletin (Sept. 2013)*
- **Leadership and Motivation Matters,** *ESOP Assoc. Bulletin (Sept. 2012)*
- **What's In Your ESOP Wallet?,** *ESOP Assoc. Bulletin (May 2011)*
- **Break Glass for ESOP Help!,** *ESOP Assoc. Bulletin (Oct. 2010)*
- **ESOP Corporate Governance Survey,** *NCEO Publication, Co-editor (Dec. 2009)*
- **Don't Read This ESOP Article,** *ESOP Assoc. Bulletin (Aug. 2009)*
- **It's Not About the ESOP...,** *ESOP Assoc. Magazine (Summer 2008)*
- **Oral & written testimony for Maryland Senate Bill 820,** *supporting the use of ESOPs to create and retain jobs and businesses in Maryland (March 2009)*
- **What Small Employers Need to Know About HIPAA,** *(co-author) Journal of Pension Benefits, Vol. 10, No. 4 (Summer 2003)*
- **Advantages of Employer-Provided Benefits,** *ACA Journal Nov. / Dec. (1999)*
- **Restructuring the Tax System:  Boon or Bust for Employer-Sponsored Benefits?,** *(co-author) ACA Journal Vol. 5, No. 3 (1996)*
- **Tax Court Makes It Harder for IRS to Show That a Plan Has Been Partially Terminated,** *The Journal of Taxation, Vol. 79, No. 1 (July 1993)*

31

Speaking Engagements

- **MAC ESOP CEO/CFO Roundtable.** *Springfield, VA (June 2014)*
- **Match Game: Aligning Your Brand, Vision and Core Values; ESOP Jeopardy;** *The ESOP Assoc. Annual Conf. (May 2014)*
- **Branding: What's Mission, Vision and Core Values Got to Do with It?,** *NCEO Conference, Atlanta, GA (April 2014)*
- **ESOP AACE Coordinator/Judge,** *Washington, DC (March 2014)*
- **Communications Roundtable; People or Profits?; Valuation Basics for Employees; Making Your ESOP Brand Come Alive,** *ESOP MAC Carolinas Conf. Williamsburg, VA (Mar. 2014)*
- **ESOP Hot Topics,** *MAC ESOP Breakfast Meeting, Springfield VA (Feb. 2014)*
- **Ownership Culture Workshop; ESOP: A to V Workshop,** *MAC ESOP Annual Conf., Charlottesville, VA (Oct. 2013)*
- **Liquidity Strategies for Private Business Owners,** *Tysons Corner, VA (Sept. 2013)*
- **MAC ESOP CEO/CFO Roundtable,** *Springfield, VA (June 2013)*
- **Using ESOPs for Ownership Transition,** *GWSCPA Conf., Washington, DC (June 2013)*
- **People or Profits? Can ESOPs Find the Right Balance?; Be an AACE Communicator,** *The ESOP Assoc. Annual Conf. (May 2013)*
- **Perfecting the Three P's: People, Performance & Profit,** *NCEO Conference, Seattle, WA (April 2013)*
- **ESOP AACE Coordinator/Judge,** *Washington, DC (March 2013)*
- **ESOP Hot Topics,** *MAC ESOP Breakfast Meeting, Springfield VA (Mar. 2013)*
- **Linking Leadership to Engagement,** *MAC ESOP Annual Conf., Charlottesville, VA (Oct. 2012)*
- **Nifty 50 Ideas for Your ESOP, Using Your ESOP Committee to Improve Engagement, Can ESOPs Save Capitalism?,** *Hawaii ESOP Chapter Annual Conference (Oct. 2012)*
- **What Every Internal ESOP Trustee Needs To Know,** *MAC ESOP Breakfast Meeting, Springfield, VA (July 2012)*
- **MAC ESOP CEO/CFO Roundtable,** *Richmond, VA (May 2012)*
- **Effective ESOP Committees; How to be an AACE Communicator,** *ESOP Assoc. Annual Conf., Washington, DC (May 2012)*
- **ESOP: The Ultimate Ownership Machine,** *MAC ESOP Spring Conf, Charlottesville, VA (April 2012)*
- **Using Your ESOP As A Competitive Advantage,** *NCEO Conference Minneapolis, MN (April 2012)*
- **ESOP AACE Coordinator/Judge,** *Washington DC (March 2012)*
- **ESOPs: Good to Great!; We Are an ESOP & Are Not For Sale; HR Roundtable Facilitator,** *ESOP Tri-Chapter Conf. Pinehurst NC (March 2012)*

- Sorry, We're Not For Sale!, *MAC ESOP Breakfast Meeting, Springfield, VA (Jan. 2012)*
- Making Your ESOP Your Competitive Advantage, *ESOP Assoc. Las Vegas Conf. (Nov. 2011)*
- All (4) (1) & (1) (4) All, *MAC ESOP Annual Conf., Charlottesville, VA (Oct. 2011)*
- What Every Trustee Should Know About Valuations, *MAC ESOP Breakfast Meeting, Springfield, VA (July 2011)*
- Jumpstarting Your ESOP Committee; Building a Culture of Engagement, *VEOC Conference, Burlington, VT (June 2011)*
- How to Succeed at AACE; Determining Your Ownership Culture, *ESOP Assoc. Annual Conf., Washington, DC (May 2011)*
- MAC ESOP CEO/CFO Roundtable, *Richmond, VA (April 2011)*
- HR Roundtable; The Magic of ESOPs, *MAC ESOP Spring Conf., Charlottesville, VA (April 2011)*
- Chicken or Egg: Ownership Culture & Plan Design, *NCEO Conference, Denver, CO (April 2011)*
- CEO/CFO Roundtable; Impact of Plan Design on Employee Ownership, *ESOP Tri-Chapter Conf., Pinehurst, NC (March 2011)*
- ESOP AACE Judge, *Savannah, GA (March 2011)*
- Technical Perspectives from ESOP Companies, *Moderator, MAC ESOP Luncheon Meeting, Tysons Corner, VA (Jan. 2011)*
- ESOP Design and Its Impact on Ownership Culture, *ESOP Assoc. Las Vegas Conf. (Nov. 2010)*
- Thrifty Thirty: Ways to Jumpstart Your ESOP, *MAC ESOP Annual Conf., Charlottesville, VA (Oct. 2010)*
- What's New With ESOPs?, *MAC ESOP Luncheon Meeting, Baltimore, MD (July 2010)*
- Nifty Fifty Ideas for Your ESOP; ESOP Open Mike Panel, *ESOP Assoc. Annual Conf, Washington, DC (May 2010)*
- MAC ESOP CEO/CFO Roundtable, *Richmond, VA (April 2010)*
- So You Think You Can ESOP?, *MAC ESOP Spring Conf., Charlottesville, VA (April 2010*
- Creating Effective Teams; Experts 1-1 Session, *NCEO Conference, Minneapolis, MN (April 2010)*
- Keynote Speaker; Open Book Management, *ESOP Tri-Chapter Conf., Pinehurst, NC (March 2010)*
- ESOP Hot Topics, *MAC ESOP Luncheon Meeting, Tysons Corner, VA (Jan. 2010)*
- Internal Loans; Hot Topics Panel, *ESOP Assoc. Las Vegas Conf. (Nov. 2009)*
- Creating & Improving ESOP Communications, *NCEO Phil., PA (Nov. 2009)*
- Keynote Speaker; ESOP Distributions. *MAC ESOP Annual Conf., Charlottesville, VA (Oct. 2009)*
- ESOP Benchmarking, *MAC ESOP Breakfast Meeting, Tysons Corner, VA (July 2009)*

33

- ESOPs: What's Up Doc?, *at Flippo Construction, Forestville, MD (May 2009)*
- There's No "I" in ESOP; Community Organizing Strategies as Models for ESOPs, *ESOP Assoc. Annual Conf. (May 2009)*
- MAC ESOP CEO/CFO Roundtable, *Richmond, VA (April 2009)*
- ESOP Survivor: Mid-Atlantic, *MAC ESOP Spring Conf., Charlottesville, VA (April 2009)*
- Communication Issues for ESOPs, *ESOP Assoc. Winter & Technical Seminar, Phoenix, AZ (Feb 2009)*
- ESOP Valuation in a Bear Market, *MAC ESOP Luncheon Meeting, Tysons Corner, VA (Jan. 2009)*
- Employees in ESOP Governance Roles, *MAC ESOP Annual Conf. Charlottesville, VA (Oct 2008)*
- Shaping ESOP Behaviors; Employee Participation in Formal Governance *ESOP Assoc Las Vegas Conf (Nov 2008)*
- Communicating Your ESOP, *ESOP Assoc. Annual Conf. Washington, DC (May 2008)*

34